Mr. Toth. I had a law clerk named Toth this year ago. May it please the court, Brian Toth representing the United States. Speak up, speak up. May it please the court, the United States brought this civil clean water enforcement action against two residential developers who discharged dirt and fill material into wetlands and streams without first obtaining a permit from the Army Corps of Engineers. But shortly after the government filed its case, the district court conducted a series of highly unusual pretrial proceedings, culminating several years later and several years after the case lay dormant in an eight-page summary judgment order lacking careful analysis that sanctioned the government by awarding the defendants reasonable attorneys' fees and by purporting to grant summary judgment to the defendants on all the claims in the government's case. Do we know why the case was dormant for so long? There's no indication. I mean, wasn't — was there — did this continue, this dumping or whatever you want to call it, or putting stuff wherever it was, did it continue? I mean, didn't the government try to press the issue, or did you just let it sit there? We tried to press the issue in 2012 by requesting permission to have experts go onto the site to investigate, among other things, evidence of additional discharges that could have potentially formed new counts in our complaint, but the district court denied us permission to do that. We had already briefed the summary judgment motion. It was the defendant's summary judgment motion.  It was the judgment in the government's favor at that point, so we really had no recourse to continue to investigate the property. Additionally, I think a lot of the property has already developed into residential development, so it involves going onto properties of third parties for which, if they are unwilling, we'd have to get subpoenas, which the district court, again, didn't allow. Well, you were investigating the property for three years before you filed a civil enforcement action, right? Absolutely. That's correct. So you should have had plenty of time to amass evidence. We did. And we had evidence to support a decision to bring suit and to support the EPA's administrative orders, which are premised on a finding of Clean Water Act jurisdiction. And now the second case makes clear defendants can challenge. So if they wanted to challenge and test the government's evidence supporting those determinations at the outset of the suit, there was an avenue for them to do it. It was to bring an APA claim in the style of Sackett, but they didn't bring that here. Even for the several years the suit was pending. Well, that's because they predated Sackett, didn't they? Well, Sackett was decided in 2012. Right. And three years later, you know, they still had three years to try and bring a counterclaim of that sort, even after Sackett. I mean, we point out in our brief that that really shouldn't matter because in the Faisal case from the Second Circuit, it makes clear that for running under the statute of limitations, a new cause of action doesn't accrue when the Supreme Court issues a new precedent. So I think the same principle should be applicable here. But I would like to focus this morning on three of the district court's missteps here. First, the district court applied an incorrect standard of substantive law by misusing and misinterpreting the Supreme Court's latest decision on what constitutes waters of the United States in Repanus. Second, in addition to misapplying the substantive law, the district court disregarded familiar fundamental principles of summary judgment practice as well. And finally, the district court abused its discretion in terminating the government's case before suit without allowing a meaningful opportunity for the government's request of the court. Turning first to Repanus, the district court's main error in applying the plurality standard was that it disregarded the modifier relatively in the requirement that waters be relatively permanent. That's the first of two main requirements that the plurality would impose. I should note, just kind of as a placeholder, that there's a debate about what of the Repanus opinions the government needs to meet and satisfy in order to satisfy the Act. But we don't believe that this Court can do that. I'm happy to answer questions about that, but we don't believe that the Court needs to resolve that question that agrees with us that we've demonstrated genuine issues of disputed fact as to both the plurality standard and Justice Kennedy's concurrence. Sotomayor, why would we not have to resolve that if we do what you ask and remand for trial, then the judge has no guidance for trial? So how would he correct any error that you say he's made? Well, the Court certainly could reach that issue. I mean, the government's position is that we agree with the three courts of appeals who have held that either standard will suffice, the first, the third, and the eighth circuits. The First Circuit's decision in Johnson is particularly instructive here and explains why the Marks principle is not really workable here. Neither of the concurring opinions, concurring in the judgment, either the pluralities or Justice Kennedy's, is a logical subset of the other. And so it is very difficult to figure out at the outset what is the narrowest common ground on which the result in that case was reached. So the three courts of appeals I mentioned have determined that in such a situation and this is consistent with this Court's case law interpreting Marks, you can look to the dissenting justices and determine that they would have upheld Clean Water Act jurisdiction if either the plurality standard or Justice Kennedy's standard  Sotomayor, I don't understand using dissenting justices to understand, for purposes of a definitive legal interpretation at all. It's unusual. It's not the norm under Marks. No. Three courts of appeals have determined, and this is not, I mean, Rapanos isn't — it's a difficult opinion because it's so fragmented. So the courts of appeals have struggled with this question. When this Court had a post-Rapanos case in Lucas, you probably already know this, it declined to resolve the question. And that case did involve jury instructions, albeit in a criminal case. But, you know, those instructions were upheld. It's a different burden in a civil case, obviously. But even without resolving the question, I think the district court may still have some instruction. Well, why don't — because at some point, you know, that's a legal issue, and I guess we can read Rapanos as well as any of the other courts can. Would you please get to the facts here? Because, you know, you have the nexus test, and then you have the, what, connected waterways test. And I have a big problem with your connection argument, because it seems to me, at least as to one of these — and I'm embarrassed, let's see — at least as to one of these sites, the water allegedly went into three to four, quote, seasonal tributaries that are barely marked on the map, which in turn went into the so-called dry creek, which I think Judge Hughes meant what it said, which is also seasonal, which then went into Spring Creek, which is, quote, navigable. But the wetlands allegedly drain water into those tributaries. Now, what is the likelihood that the Rapanos plurality judges would have found this a sufficient connection to the waterways? So stepping through the pluralities analysis, you first have to look at whether the tributaries that are adjacent to the wetlands are relatively permanent waters. And the evidence in the record here demonstrates that in the best professional judgment of government's experts, they believe that the waters flow for a seasonal amount of time, at least three months out of the year. Well, what do you mean they believe? I mean, again, you had three years to examine this. Why couldn't — I mean, belief isn't very strong. So that — I'm using that to paraphrase everything they relied on. They relied on their pre-complaint field visits. They relied also on a suite of what they call desktop data, which includes ordinary topographic maps that they analyze in a computer geographic information system. They look at everything from aerial photos to other remotely sensed data. They actually have laser — data from lasers that bounce off the landscape and can show various forms of elevation. And they — the photo interpreter here, he has decades of experience interpreting this type of data, can estimate from the topography of the land and see whether there are actual stream channels that correspond with their field observations. So it would be ideal — I agree, it would be ideal if we had detailed studies demonstrating flow data for 365 days out of the year for a series of years. That's the perfect situation to demonstrate. But, you know, the reality is that EPA is investigating lots of these violations, and it has to — it has to assemble enough evidence to support its case. But — and, of course, the Justice Department makes a judgment when it brings suit that it has enough evidence. Well, let me ask you a question, though. How many — how many areas within the greater metropolitan Houston, Montgomery County and surrounding counties' landscape would qualify as wetlands under this series of connections and seasonal flows and so on, just approximately? I understand that. I don't know the answer to that. Well, the — you know, because the problem is Houston's about 100 feet above sea level. So there has to be a limiting principle. I agree. Right. What's the limiting principle? So it's a very fact-based analysis, and we're not asking the Court to rule in the United States' favor and definitively say there must be wetlands found on this property. We didn't move for summary judgment. I understand. So what we're saying is that a reasonable fact finder could conclude that the waters — the tributary areas are relatively permanent based on the evidence that we presented. There are different views, reasonable views of the evidence. Again, I mean, how many — how many locations within the Houston — greater metropolitan Houston area is EPA examining at the present time? I mean, if a jury found that this is a wetland, there's Cypress, there's Spring, there's the Sugar Land area, all of which — there's Bel Air, all of which are prone to seasonal flooding. And I've lived there for many — you know, 40 years, I know. So I — you know, I think that there — And the water seeks its own level. So everything — you know, if we have — the theory is if we have seasonal rain and there are ditches, the rain is going to go into a ditch, which goes into another ditch, which either goes into the storm sewer system or goes into another ditch, and then eventually it's going to reach Galveston Bay. So there are mechanisms to address these concerns about the predictability. There's concerns about the scope, the large scope. There's also concerns I've heard expressed about predictability. And there are mechanisms to address understanding what the coverage is, especially after SACCOT, especially after HAWKS. Regulated parties can, before discharging, request a jurisdictional determination from the Corps of Engineers, and then now HAWKS makes clear, challenge that. Well, that doesn't help these people because they've been under the gun since 2007. Yes. Well, they've — And the 2015 regulation that was purportedly going to clarify all this has been stayed pending litigation, is it not? Correct. That's correct. So we're — So there's really not much certainty. Correct. But their avenue is to — and they could have done this. They knew SACCOT was coming, and they knew even after SACCOT — Nobody knew SACCOT was coming. Excuse me. I'm — Very well. I've been in this business. I didn't expect the Supreme Court to rule that way, and they ruled 5 to 4. It was a real — very close-run thing. But they've at least had several years since SACCOT was decided to attempt to amend their counterclaims and bring a challenge. Well, I'm just — I mean, you know, the facts are what they are. Judge Hughes used an admittedly extraordinary Judge Hughesian-like approach to discovery and ruling on the case. But at the same time, I am very concerned that if the bulk of the evidence is maps, topography, and expert witness testimony, as opposed to flow data and charts, that there is no limiting principle in coastal areas. I understand Your Honor's concern. I would point out in Lucas, the United States — which was a criminal case — the United States also — Mr. Stokely also included evidence of aerial photographs. There was discussion of the significant nexus test and the plurality standard, and neither discussion mentioned the need for quantitative studies or flow data. Other courts have made clear that — the Fourth Circuit and the Sixth Circuit — that no particular form of data is required to support the tests. Certainly at a minimum, we ought to have had an opportunity to obtain the quantitative information that the district court found lacking. And I see that I have just a few seconds left. Go ahead. So just to turn — turn briefly to the summary judgment principles. I mean, I think one of the fundamental missteps about this case — and please just tell me when I should stop. I'm going to try and just go on for a minute or so about the summary judgment point — was that the district court did not apply what an ordinary court would sitting in deciding a motion for summary judgment. He — this would be a jury trial. The defendants requested a jury trial. He would not be the ultimate finder of fact. And so it was his role to determine whether there was simply a dispute that could — enough evidence in the record to support a reasonable conclusion that the Rapata standards, either of them, was met, not to adjudicate whether wetlands were definitively on the property. All right, sir. Well, when you return, I would be interested in knowing how you — what, if any, limiting principle there is in the nexus test. Very well. Thank you. Okay. Mr. Allen. Good morning, Your Honors, and may it please the Court. The alleged pollutant discharge in this case is a result of the defendant moving dirt on their own property. The alleged affected jurisdictional waters of the United States are the West Fork of the San Jacinto and Spring Creek. There is no data, no measurement to indicate that there has been an increase in erosion or an increase in turbidity, which is the alleged observed difference in the affected areas, that there has been any increase in the affected — in the jurisdictional waters of the United States, that is, Spring Creek and the West Fork of the San Jacinto. Would you try to address this discovery issue? Yes, Your Honor. The EPA's — No, I asked your opponent to do the same thing. Thank you, Your Honor. I just wondered. We didn't hear anything about that. The EPA's investigation in this case, which began as early as 2002, gave them a lot of access to property and a lot of access to documents prior to filing the lawsuit. I heard from them to go back and check to be sure nothing else has happened before you go to trial. I don't understand what the big problem with that would be. The trial court's ruling to deny entry upon land was to not give the government access to attempt to discover whether the affected areas were jurisdictional prior to the development. That information wouldn't have changed. And furthermore, the United States failed to attempt to make a technical discovery of an increase in turbidity or a change in the traditionally navigable waters of the West Fork or the San Jacinto, which they could have done without the relief that they requested from Judge Hughes. They could have gone into that and taken measurements on the traditionally navigable waterways in an attempt to show that there is an increase of erosion or an increase of turbidity. Is that their burden? I mean, what case says that's the burden? Well, the Precon case out of the Fourth Circuit noted that there was an analysis, a comparative analysis. So you have point A, which is the affected area. That would be the alleged wetlands in this case. And then you have point B, which are the jurisdictional waters of the United States. The only analysis in the technical presentation, and the technical presentation is what I refer to in the summary judgment response, which is in the record at... It's a technical response? It's called a technical presentation. And it has... The government's technical... Is that one of the affidavits of Stokely or the other fellow, or what? Jim Harrington's declaration and Peter Stokely's declaration are both present in that technical presentation. Right. Well, what I'm saying is, if you step back, their burden was to prove that the ponding waters on... Is it Lipar or Lepar? What do you pronounce? Lepar. Lepar. Lepar's property ultimately discharged some sort of pollutants into a navigable water, right? Correct. All right. So you're saying increased erosion and increased turbidity are proof of that kind of discharge? Could be, if there was an observation of data or some evidence. Yes. I mean, but that's not the only proof, right? Rapanos didn't say that was the only proof. No, and that's the Kennedy concurrence. That's the significant nexus test that the turbidity analysis would go to. It would show that there's a significant nexus because there's a substantial change in the physical, chemical, or biological makeup of the traditionally navigable waterway. They failed to meet that standard because they did not provide any evidence of a change in turbidity. Actually, the technical presentation only opines that there is turbidity, but there's no measurement, no data measurement of pre-development turbidity and the intermittent streams that were affected. And in post-development turbidity in those streams, let alone pre or post either with respect to the traditionally navigable water, Spring Creek or the West Fork or the San Jacinto. Well, you've already, I mean, there are houses all over this area, right? Yes. I mean, basically, I don't know if the development is complete, but I went on, frankly, went online to see what houses were for sale. And so whatever that originally looked like in 2002, it's completely filled in now, right? Almost completely. The development is complete. Right. So what kind of data could they possibly obtain at this point to show turbidity or erosion? They could show an increase in erosion in the traditionally navigable waters, the West Fork or Spring Creek. That data is presumably available in public documents, and they made no attempts to measure the post-development turbidity to make a comparison. You said the development is complete. Yes. It's done. The lots and streets and whatever. Houses. Yes. Not necessarily houses. No, houses. I believe the houses are completed too, Your Honor. They're expensive. But, okay, so, but you're, you know, you're really not answering Judge Dennis's question, which is that there, this extraordinary procedure where Judge Hughes has a motion, what is it, a motion hearing set on some sort of preliminary discovery motion, and then he takes up the summary judgment thing unbidden in April of 2011, and then sits on the case for another three or four years, and then rules in your favor. That is an unusual posture, Your Honor, and, frankly, I'm not sure why the case lied dormant for three years after the denial of the motion. Well, what do you say about filing a summary judgment motion, and then he doesn't give either party notice that he's going to hear it, and then he takes it up? Well, after the, after the hearing, which admittedly was not docketed, and there wasn't notice of the hearing in advance of it, there was over a year before the United States took any action to seek a continuance or to seek discovery. That hearing happened in April of 2011. The motion for entry on land is 13 months later, in May of 2012. Well, suppose they had, so is that just a matter of characterization, like, so they moved to enter on land, but they could have moved under 56D? They could have moved under 56D, Your Honor. They could have sought entry upon land at any course during the, at any point in time during the lawsuit. There is an order that the United States characterizes as restricting their ability to conduct discovery, which is the automatically generated order that Judge Hughes enters in his cases, and it does require leave of court before seeking depositions or for seeking any kind of discovery other than a request for production. But that is the framework through which the discovery operates in all of his cases, and we sought leave to take depositions in this case. They never sought to have entry on land for the inspection that they say they needed, and furthermore, the technical presentation that's attached to their summary judgment response that sets forth the basis of their jurisdictional allegations. Well, and that's a problem that I have. Let me just ask a quick question. Were we, if we were to reverse and remand, does LIEPER have any intention of submitting its own evidence at some point in time? Oh, yes. I mean, yes, at the time of trial, certainly. Okay. But apart from that, I mean, there's about hundreds of pages of this technical presentation, right? And Judge Hughes issued an eight-page opinion and with a totally legal conclusion, so we don't understand his approach to any of this technical information, do we? No, Your Honor, but I could go through the technical information. Well, I know you can, but we don't know what the judge did, do we? We know that the judge found there was no evidence of jurisdictional water. Well, I know. I mean, he might have found no evidence because he didn't even look at it. I mean, that's one of the peculiar things about the way in which he ruled. That's true, Your Honor, but if he did look at the evidence, he would have, or the technical presentation, he would have found that it wasn't sufficient to meet the Rapinoe standards. The basis for, and this is... But did he even use the Rapinoe standards? We don't know what standards he used, do we? Yes, Your Honor. The first part of the opinion, the first part of the opinion on the merits, dealt with the Scalia plurality test, which is the continuous surface connection. And then I believe the quote is that the United States fares no better under the other test. And then he moves on to the significant nexus test. So he analyzes the evidence under both tests in his opinion. Well, he doesn't really analyze it, but he cites both of them. As it relates to the evidence in the technical presentation, Peter Stokely and Jim Harrington have identical declaration testimony that they relied on maps and aerial photographs and the fact that maps have a dotted blue line to show that those dotted blue lines indicate a seasonal stream. There was no observation, no boots on the ground to say that those streams had a continuous surface connection to a traditionally navigable body of water. And that was what was present in Lucas. The government's expert had actually walked the property or seen the property and could say through testimony that it was a continuous surface connection. Well, couldn't you do that by topography? You could, Your Honor, but they did not. They admit that the streams are intermittent. What about these pictures of standing water? I mean, we got a few pictures out of the record and they're pictures of standing water. There are pictures of standing water, Your Honor, but all that indicates is that some of those areas drain water after it rains, which is on the wrong side of consistency to be considered a water of the United States under the Scalia plurality test, which requires at least seasonal, which means, and this is in the context of the term water, the term waters under the Clean Water Act as opposed to water. The term waters is used because, as that opinion writes, it is used to describe a geological formation that normally contains water as opposed to the molecule H2O. So the types of bodies of water that would qualify as waters would be lakes, rivers, oceans. And then on the side of ephemeral that would not be considered waters of the United States, you have ephemeral streams, gullies, drainage ditches, that kind of thing. And that's what these intermittent streams are. They're identified as intermittent in the technical presentation. The Scalia opinion specifically says intermittent bodies of water are not seasonal. They do not run consistently enough to be considered jurisdictional waters of the United States. Well, he puts a lot of weight on the word relatively. He does, Your Honor. Importantly, the deposition testimony of, I believe it was Mr. Harrington, acknowledges that the dotted line could also mean intermittent, but it doesn't necessarily mean seasonal. It could also indicate just an intermittent stream, and that's consistent with his technical presentation where he identifies those streams as intermittent. He admits... I thought their brief said that intermittent and seasonal were functionally identical. The brief does say that. Scalia's opinion in Rapinos says the opposite, that a seasonal, regularly flowing body of water can be considered for making a continuous surface connection, but that an intermittent stream is too ephemeral and does not meet that standard. Do you agree that they can't... the government can meet either the Scalia opinion test or the Kennedy nexus test and, you know, in order to find waters of the United States? No, Your Honor. I believe that, first, that the issue which is not presented to this Court doesn't need to be decided by this Court because this is Lucas in reverse. In Lucas, all the tests were met. In this case, none of the tests were met. But if the Court were to conduct a Marx analysis, I think the first point is, as, you know, the Court admonished us in Marx, we need to pick the rule that reflects the concurring justice who concurred in the judgment on the narrowest grounds. And in this case, that would be the Scalia plurality. The Scalia plurality clarified the adjacency standard from Riverside Bayview to mean that in order to prove adjacency, you've got to prove a continuous surface connection to a traditionally navigable body of water. And that's all that... that's all that opinion did. But none of the other circuit courts have adopted that approach, right? That's correct. And the Garland opinion that this... that Your Honor, Judge Dennis wrote, the Court does not feel bound to follow the Marx analysis of other circuit courts if it disagrees. And in fact, in that opinion, the Court observed that the rule, when it's not clear which is broader and which is narrower, is to adopt an opinion that gives full effect to all the five judges necessary to carry the day, to form the judgment. And if you agree with Kennedy's analysis and the Rapinoe's decision, Kennedy gave an example of a case where his test was narrower than the Scalia test. And that example is, you have a thin trickle that has a continuous surface connection to a traditionally navigable body of water. That thin trickle would meet the Scalia test because it would meet the adjacency standard. But it would not meet the Kennedy test because there wouldn't be a significant nexus between that thin trickle and the traditionally navigable body of water. There's no effect in anything you do to that thin trickle, really, to the traditionally navigable body of water. The contrast is, you have a ravine that has millions of gallons of water that drain into a traditionally navigable body of water. But they only drain after it rains. So you have an ephemeral body of water but that has millions of gallons. So that has a significant impact on the traditionally navigable body of water. But it does not flow seasonally. It's intermittent. And so it would not meet the Scalia test. If the Court's persuaded by that analysis, then you have a situation where neither test is strictly broader or narrower than the other. And the Court would then need to find the rule that gives effect to all five Justices, which would be, of course... Do we have any surface-to-surface adjacent type problem in this case? I'm not sure I understand Your Honor's question, but... Under the Scalia opinion, doesn't he talk about that wetland must be adjacent on the same surface?  That's the continuous surface test. And if the land peters out on the surface, if the water peters out or is intermittent, then it cannot be the bridge that forms that continuous surface to a traditionally navigable body of water. And that's where... Marsh is where you go. He's talking about duck hunting there, don't you think? A wetland is where you go duck hunting because he was a big hunter, you know. That's true, Your Honor. And that brings up an important point. The CFR, the CORE, and the EPA's are saturated so much that it has hydrophytic vegetation or vegetation that can only be sustained. And they said they found evidence of that. They did say they found evidence of that, but the technical presentation classifies it as a wooded area. They don't identify... You can't have hydrophytic in either a mushy wooded area or a wetland, right? You could, Your Honor, but that's... As long as you've got enough water. That goes to the point of there was no measurement of the saturation to show that it was indeed a wetland. The observation of hydrophytic plants did not identify plants in the areas that were at issue. If you look at the Stokely and Harrington declarations. And they did not ever make a wetland delineation in this case. They never made a wetland delineation in this case. They never made a jurisdictional determination in this case prior to the technical presentation which was produced on Judge Hughes' orders. The investigation in this case that occurred from 2007 to 2010 involved a lot of cooperation from the LEPR defendants. We gave them access to the land and we asked in exchange that they would do a wetland delineation and a jurisdictional determination. They never did and in fact there's a memo on EPA notes that's attached to the summary judgment record, to their MSJ response that says don't give  to the LEPR defendants and don't give it to the Corps. What's that supposed to mean? That means that they weren't sharing the information to give a wetlands delineation. He spried it out of them. He did, Your Honor. This is prior to the lawsuit after administrative orders and threats of $32,500 per day were levied against my client. I certainly understand that but at the same time it's always too easy to take one little memo out of context so you don't know what the full context could have been all work product at that point in time. That's true. It could have been but the fact is the LEPR defendants requested a jurisdictional determination and a wetlands delineation prior to the lawsuit. I have two particular questions. One is that I think you've been talking largely about the Scalia opinion but for the sake of argument address the Nexus opinion also and the second one is the government points out you did not address at all their contention that LEPR filled I think it's 2.5 miles of quote streams. If I could address the second point first. I believe that's areas D, E, and F and G in the Benner's Landing development. Those are classified by the government as streams. The evidence shows that they are contours of the land where rain sometimes drains. Whether they are classified as wetlands or as intermittent streams that don't satisfy the waters of the United States standard. Either way they do not meet the standard for jurisdictional waters of the United States. So there's no question you filled it whatever it was and the question is whether it was just ditches or streams. Correct. Or if there were streams if the streams were stationary. But you didn't even brief that. You didn't even brief in response to that. No your honor because whether they were wetlands or streams is independent from the jurisdictional analysis. Wetlands or intermittent streams I should say. To address the Kennedy concurrence test to satisfy that test the government has to show a significant impact on the physical, biological, and chemical makeup of a traditionally navigable body of water. Speculative or insubstantial evidence does not suffice. They make no comparison between the existence of the jurisdictional bodies of water that is the Spring Creek and the West Fork of the San Jacinto. No data whatsoever to show a change in them. To show any property that could be affected by the developments in this case. And they make no data measurements whatsoever to show that that's what would bring the case within pre-con that might raise a fact issue. Last point they could have gone out and looked at the traditionally navigable bodies of water, the West Fork and Spring Creek without the judge granting the motion for entry upon land. And I see that I'm out of time your honors. Thank you very much. Thank you. Mr. Toth. Your honors. Your honors highlighted a problem with Judge Hughes' order that really is persistent throughout this appeal. And that's that it is so cursory in locking in any careful analysis that we don't really know his reasoning for rejecting a lot of the government's arguments. Where he didn't find enough evidence, he ought to have said that. And then he didn't even address our Rule 56d motion, which we did make in the body of our summary judgment response. So we did request a continuance for discovery within the body of our opposition. And so that was properly preserved. And the judge should have at least addressed it to say why he was going to grant summary judgment, notwithstanding that request. As far as the two and a half miles of streams, it is important that they were neither addressed by my friend's opposing brief or by Judge Hughes in the district court, because those need only be relatively permanent waters to for there to be jurisdiction. And they formed other accounts in the government's complaint that Judge Hughes did not resolve before he entered judgment against the government. So they were left hanging out there. They were not addressed. And that is controversial. As far as the discussion about intermittent or seasonal streams, intermittent is not a term of art. It's noted in Rapanos that there is a legitimate scientific debate about how frequently a water must flow in order for it to be qualifying as seasonal. But neither Rapanos nor the district court here engaged in that debate at all. The government's evidence demonstrates that in this case, based on the experience of these two expert declarants, that when they go and do a field site visit of streams that are marked on a map created some years ago as saying intermittent, they in fact flow at least three months out of the year. And I would point out that one of the streams in our evidence, the Tantro Gully, and it's not one where we alleged it was filled directly, but we did allege that there were wetlands adjacent to that that were filled. That flows not just seasonally, but by our own evidence throughout the whole year. And so that, again, is another piece of low-hanging fruit on which the district court's order ought to be reversed. Could the district court have found that gully, that certain acreage adjacent to that gully was technically covered wetland but that none of the other property was? You would have to find that. I don't believe so. When you said none of the other property, I take it you're referring... It's a lesser included offense, in other words. You've marked off, you've said that they're in violation with regard to something, 10 or 15 different areas. Correct. This was Area B in our... Why couldn't a fact finder find a potential violation as to one area as opposed to all 15 of them? They were separate counts. This was the count dealing with areas A and B. So that's what I'm saying. So that's the way it would go to a jury. This was count 2 in the government's complaint. Okay. So it would have included the filling of the wetlands and another tributary other than Cancho Gully. So it's possible it could have gone either way on that count because it does include other fills. I mean, it is possible that we could reverse and remand and tell Judge Hughes he didn't write enough and then he would write enough and find that neither test was satisfied. He could. He could. I mean, we think if that is going to be the outcome, then you ought to also instruct him to allow some meaningful opportunity for the government to take discovery before the trial. How much discovery are we talking? So targeted discovery, basically what we asked for in our 5060 request and our site inspection request, we're looking to we've retained independent experts to corroborate the findings of the agency scientists as we normally do when we're going to trial. And those experts need to visit the property. They haven't been out to the property itself. They've been out to neighboring properties. They have been down to various downstream areas and have installed stream gauges at other places, not on the property. But if you look in the government's request for site inspection, it outlines about five days where seven people would need to be out on various places on the property. What are they going to do? So they're primarily going to take soil samples and look I mean, as this area has already been filled, they need to take a soil core. You're marching through people's backyards. You know, they will replace it. We say this in our site inspection motion. They'll replace the soil as it was when they filled it. Yes, it would require subpoenas, and that's why the judge denied it. The purpose of that is to see if any of the same type of soil can be found way below, washed away. Right. Because this is difficult to prove after the fact that wetlands have been obliterated, essentially. So we're having to go back and reconstruct what was there before, which is why reliance on a lot of this aerial photograph helps. Let me just ask you a stupid question. If they filled in all of this, we still know Houston is low-lying. They had to construct drainage ditches, right? Isn't it likely that the storm sewers would have gone into San Jacinto River or Spring Creek? If it is, I mean, you know, that's a separate... Doesn't that ameliorate... I'm just asking you a practical question. Doesn't that ameliorate anything? So if the sediment runs off into the larger body of water and gets diluted enough... Right. I mean, the idea, though, I don't think it does because the idea is that the contributions to the upstream waters eventually flow and have a significant effect on the downstream water. So putting it in the downstream water directly doesn't really alleviate those larger concerns. How good are your aerial autograph capability? Do you do a pixel analysis like I was reading about they're now able to look at actual combat pictures with pixels and tell who was... who was the American soldier who got left behind and may get the Medal of Honor? That's fairly remarkable. I can't say, standing up here, that we can do that to that fine-grained level of detail. You're not looking for bunny rabbits in the brush. No, we're looking for topographic features. You know, indentations in the land that are more than just a rill or a ditch that would actually... and would indicate... You know, we're looking at a series of years or decades of photos. Is there... I mean, I don't... I really don't understand what the limit is that EPA defines here because the entire coastal area of the United States is essentially low-lying land with intermittent ditches and at some point you know, water runs into the ditches. So how is it possible that any of that stuff is excluded from jurisdictional wetlands according to EPA? EPA has taken the step, as you mentioned before, of promulgating a new clean water rule. It's currently stayed, and so what we have is Rapanos. But this case and Rapanos... Well, it's sort of an anti-Rapanos rule, as best I can tell. Well, it provides more clear limitations, at least. The idea of providing some predictability, whether regulated parties may supply it or not, or how far it reaches, that remains to be seen, and they'll have their day in the Sixth Circuit. But EPA has made an effort to institute some of that predictability and to cabin the scope of the statute in a reasonable manner. Congress drafted it, or enacted it, and... Well, I don't think anybody among the founders thought the waters of the United States included even wetlands. They were thinking of the Potomac River and the St. Lawrence Seaway and the Hudson and so on, but... So we've come a long way from that. Yes, and I don't think this case will be the last word on Clean Water Act jurisdiction by any stretch of the imagination. Thank you. You're welcome.